IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JOAN K. KELLER,

             Plaintiff,

v.                                                      Civil Action No. 2:09-CV-127

MICHAEL J. ASTRUE,
Commissioner of Social Security,

             Defendant.


**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**

**I.  Introduction**

A.       Background

Plaintiff, Joan K. Keller (Claimant), filed a Complaint on October 28, 2009, seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on April 5,

2010.[2]  Claimant filed her Motion for Summary Judgment on April 22, 2010.[3]  Commissioner

filed his Motion for Summary Judgment on May 24, 2010.[4]

B.       The Pleadings

         1.       Claimant's Brief in Support of Motion for Summary Judgment.

---

[1] Docket No. 1.

[2] Docket No. 13.

[3] Docket No. 19.

[4] Docket No. 20.

2. <u>Defendant's Brief in Support of Motion for Summary Judgment</u>.

3. <u>Plaintiff's Reply Brief in Opposition to Defendant's Motion for Summary Judgment</u>

C. <u>Recommendation</u>

For the foregoing reasons, I recommend that:

1. Claimant's Motion for Summary Judgment be **DENIED** and the matter be **REMANDED**. The ALJ did not err by finding Claimant not disabled under either Listing 12.04 or 12.06, nor did the ALJ err in her credibility analysis. However, the ALJ failed to correctly evaluate the opinions of Claimant's treating physicians and, therefore, erred in developing a hypothetical question to pose to the Vocational Expert.

2. Commissioner's Motion for Summary Judgment be **DENIED** and the matter be **REMANDED** for the same reason set forth above.

## II. Facts

A. <u>Procedural History</u>

Claimant filed an application for Disability Insurance Benefits (DBI) on June 25, 2007, alleging disability due to panic attacks, major depression, anxiety, Post Traumatic Stress Disorder, and tremors in head/neck beginning September 30, 2006. (Tr. 87-92, 106). The claim was denied initially on October 18, 2007, and upon reconsideration on January 9, 2008. (Tr. 52-54 & 59-61). Claimant filed a written request for a hearing on January 31, 2008. (Tr. 63). Claimant's request was granted and a hearing was held on January 14, 2009. (Tr. 25-47).

The ALJ issued an unfavorable decision on March 18, 2009. (Tr. 11-24). The ALJ determined Claimant had no impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1 (20 C.F.R.

404.1525 and 404.1526), Claimant had the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c) with certain exceptions, and there are jobs that exist in significant numbers in the national economy that the Claimant can perform (20 CFR 404.1569 and 404.1569a). (Tr. 17-22). On April 6, 2009, Claimant filed a request for review of that determination. (Tr. 9). The request for review was denied by the Appeals Council on August 21, 2009. (Tr. 4-8). Therefore, on August 21, 2009, the ALJ's decision became the final decision of the Commissioner.

Having exhausted her administrative remedies, Claimant filed a Complaint with this Court seeking judicial review of the Commissioner's final decision.

B.    Personal History

Claimant was born on February 17, 1949, and was fifty-seven (57) years old as of the onset date of her alleged disability and sixty (60) as of the date of the ALJ's decision. (Tr. 29, 87). Claimant was therefore considered a "person of advanced age," age 55 or older, and generally, whose age significantly affects a person's ability to adjust to other work under the Commissioner's regulations at the time of her onset date and at the time of the ALJ's decision. 20 C.F.R. §§ 404.1563(e), 416.963(c) (West 2010). Claimant achieved an undergraduate degree and a masters degree equivalency. (Tr. 29). Claimant has previous work experience as an elementary school teacher. (Tr. 31).

C.    Medical History

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's determination that Claimant's subjective complaints were not entirely credible:

**Medical Records, Dr. Botros, Selma Medical Associates, 10/5/04 - 12/8/08 (Tr. 176-205, 310-19, 358-64, & 379-81)**

10/15/04
- subjective: crustiness in her ears; anxiety; under a lot of stress at work, which causes her to be anxious and depressed; denies suicidal ideation
- objective: vital signs are stable; examination of both ears reveals evidence os seborrheic dermatitis lesion on the right external canal; no evidence of ruptured tympanic membranes or otitis media
- assessment/plan: seborrheic dermatitis - apply hydrocortisone; anxiety - Paxil

1/17/05
- subjective: follow-up on anxiety and panic attacks; wondering about E.coli infections; doing better on Paxil without side effects
- objective: vital signs are stable
- assessment/plan: anxiety and depression - doing well on Paxil; symptoms of cystitis - check a urinalysis

4/1/05
- subjective: concerns with Paxil - doing well but gets headaches; took herself off the medication; has some suicidal ideations but no plans; emotional and gets easily angered
- objective: vital signs are stable
- assessment/plan: depression/anxiety - restart on Paxil

4/22/05
- subjective: follow-up on depression; doing well on Paxil; sinus symptoms - fevers, chills, sinus pressure; some cough
- assessment/plan: depression - doing well on Paxil; sinusitis; hypercholesterolemia; history of fibromyalgia

7/22/05
- subjective: follow-up; rectal pain and swelling; irritable bowel syndrome and fibromyalgia are better
- objective: external hemorrhoids with some thrombosis
- impression/plan: external hemorrhoids with thrombosis; irritable bowel syndrome - stable; fibromyalgia; depression/ anxiety - off Paxil for summer; sinus headaches - resolved

1/6/06
- subjective: follow-up appointment; doing well on Paxil; denies side effects; chronic tension headaches
- assessment/plan: doing well; fibromyalgia - stable; irritable bowel syndrome - stable; chronic tension headaches

2/10/06
- subjective: sinus infection - sinus pressure, burning sensation, discolored nasal secretions, and headaches; no cough or shortness of breath
- objective: patient is afebrile; some sinus tenderness
- assessment/plan: sinusitis

7/7/06
- subjective: follow-up for hypercholesterolemia; states she is doing well; has some dry hands and sinus pressure

- objective: clear lungs; cardiac examination is regular; few areas of dry skin
- assessment/plan:
  - dyslipidemia: started on Vytorin
  - history of depression: Paxil only during school year
  - asthma: usee p.r.n. albuterol
  - health maintenance

9/12/06
- subjective: had urinary symptoms with burning but they disappeared with cranberry juice; had sinus symptoms for greater than two weeks with a lot of nasal congestion
- objective: no acute distress; well-hydrated; urinalysis was unremarkable
- assessment/plan:
  - proteinuria: believe this was a false/positive. Repeat urinalysis was normal
  - hyperlipidemia: Vytorin brought down her cholesterol nicely; she discontinued it due to myalgias and does not want any other medications
  - sinusitis: Z-pak

10/4/06
- subjective: complaining of anxiety and panic attacks; continues to have problems with her principal; has had problems with principal for a couple of years and her symptoms are always concerning with return to school; no anxiety or panic attacks during holidays or summer vacation
- objective: blood pressure is elevated
- impression/plan: anxiety/panic with significant problems at work with her principal

11/1/06
- subjective: follow-up on anxiety; has good and bad days; still has some panic attacks; does not feel ready to go back to work
- objective: vital signs are stable
- impression/plan: anxiety/panic attacks/ referred to psychiatry for further management

12/20/06
- subjective: follow-up for depression and anxiety; feeling great
- impression/plan: continue on same medications and continue to follow with Dr. Ferdous

1/11/07
- subjective: here for follow-up on anxiety

9/18/07
- subjective: sinus infection and sore throat; some fever; no chills; severe sore throat; severe sinur pressure; denies any cough; some ear discomfort
- objective: does not look toxic; some sinus tenderness over maxillary sinuses; tympanic membranes clear
- impression: possible sinusitis; take Z-pak

10/26/07
- chief complaint: pain in neck and shoulders
- objective: neck without adenopathy; no paraspinous tenderness; good range of motion; chest clear throughout; regular rate and rhythm
- assessment: right neck pain
- plan: encouraged anti-inflammatory; follow-up with primary; recommended heat and exercises

11/14/07

- subjective: follow-up; some neck, shoulder, elbow, hand, and knee pain; treated recently for sinusitis and ear infection; ears improved but sinuses have not
- overview of systems: no fever, chills, or night sweats; some sinus pressure and postnasal drainage; some cough with a taste of blood; history of Chlamydia pneumonia; no oral ulcers; some abdominal pain
- objective: does not look toxic; vital signs stable; some sinus tenderness; no joint inflammation; lung examination is clear; cardiac examination is regular
- assessment/plan: sinusitis - start on Avelox; Arthralgia, etiology unclear - continue ibuprofen; question of cough - check chest x-ray
11/29/07
- subjective: follow-up; significant improvement in sinus symptoms and all arthralgias; sedimentation rate and Lyme titer were negative; some right shoulder pain
- objective: vital signs stable; Lyme titer negative; sedimentation rate negative; CBC normal
- impression/plan: sinusitis - improved; arthralgia - etiology unclear, question fibromyalgia exacerbation
11/29/07 PA and lateral chest
- clinical history: coughing
- impression: no acute disease
3/17/08
- review of systems: doing much better; treated for sinus infection; aches and pains disappeared; not depressed; off antidepressants; some mild anxiety
- objective: appears well; vital signs are stable
- assessment/plan: fibromyalgia; history of anxiety, depression, PTSD - all under control
3/31/08
- subjective: disability evaluation; "she was seen recently and at that time her symptoms were under control.  Now her symptoms are back with a vengeance.  She would like to pursue her disability."
- review of systems:
    - complains of dizziness, confusion, being tired, fatigue to the point that she has to go to bed, weakness, shaking, anxiety
    - complains of pain in head, neck, shoulder, chest, back
    - requires lots of sleep
    - feels depressed
    - hard for her to lift her arms above her head
    - muscle aches in thighs, calves, arms
    - difficulty driving and doing everyday chores
- objective: appears comfortable; vital signs are stable; all fibromyalgia trigger points were positive; regular heart
- assessment/plan: fibromyalgia and chronic fatigue
6/2/08
- here for disability papers; may be able to function is the job is nonstressful
12/8/08
- subjective: complaints of ear pain; no fever or chills; some decreased hearing; itching in ear; some drainage

- objective: does not look toxic; vital signs are stable; some excoriation in the right external canal; some redness and bulging of right tympanic membrane; examination of left unremarkable
- assessment/plan: right otitis media and otitis externa; started on Omnicef and neomycin polymyxin hydrocortisone ear drops

**Medical Records, Dr. Firdous, 11/22/06 - 6/18/08 (Tr. 226-34, 303-06, 329-33, & 365-68)**
11/22/06
- subjective: normal appetite; trouble sleeping; oriented to person, place, time, and situation; appropriate rapport; depressed and anxious mood; appropriate affect; coherent speech; goal-directed thought content and process; not suicidal or homicidal; fair insight; no gross cognitive defects
- memory: fair recent and past
- assessments:
        - Axis I: panic disorder/ GAD
        - Axis II: deferred
        - Axis III: migraines
        - Axis IV: stress of work
        - Axis V: 50-55
- plan: increase Paxil; D/C Xanax
12/8/06
- feeling much better with higher dose of Paxil and Clonazepam; can now do household jobs; only had one panic attack in last week
- assessment/plan: panic disorder/ GAD; Paxil; Clonazepam
12/21/06
- feeling much better with Paxil; panic attacks subsided; wants to go back to work
- assessment/plan: panic disorder/ GAD; Paxil; Clonazepam
1/4/07
- continues to have severe anxiety and anxious mood and has head tremors; not been able to drive due to anxiety; depressed mood
- assessment/plan: generalized anxiety disorder; Paxil; Clonazepam
2/8/07
- accepted losing her job and has applied for long-term disability
- assessment/plan: panic disorder/GAD; Paxil; Clonazepam
3/9/07
- feeling better in terms of her anxiety but drowsy and has low energy - may be caused by her medication; anxiety is so much better that she was able to drive to writer's office by herself, which was a big ordeal before
- assessment/plan: panic disorder/ GAD; Paxil; decrease Clonazepam
3/30/07
- feeling much better; reduced use of Clonazepam
- assessment/plan: panic disorder/ GAD; Paxil; Clonazepam
5/2/07
- doing well; gets a head tremor when under stress; thinks she's unable to work; gets confused when under stress and is very forgetful; short-term memory is poor; sleeping/eating ok

- assessment/plan: panic disorder/ GAD; Paxil

5/14/07
- head tremor worse when reduced clonazepam
- assessment/plan: panic disorder; Paxil; Clonazepam; refer to neuropsych

6/1/07
- anxiety and depression decreased due to spending time outside and playing with grandchildren
- assessment/plan: panic disorder/ GAD; Paxil; decrease Clonazepam; Topomax

6/22/07
- MRI results came back - white matter has not healed and her current cognitive deficits are due to that; taking Topomax for head tremors and they have subsided; migraines also subsided
- assessment/plan: panic disorder/ GAD; Paxil; illegible

7/13/07
- continues to have severe anxiety and panic attacks; unable to function due to those symptoms

7/26/07
- feeling better; read 7th book in book series - trying to work on memory
- assessment/plan: Paxil; Klonopin; Topomex

8/28/07
- much improved in cognition after decreasing Klonopin
- assessment/plan: decrease Paxil

10/1/07
- shown lots of improvement; mind is more clear now; started taking the grandchildren for walks; plays checkers with them
- assessment/plan: Paxil; Topomax

11/1/07
- doing very well; taking care of grandchildren
- ssessment/plan: (illegible) all medications

12/20/07
- subjective: normal appetite; normal sleep; oriented to person, place, time, and situation; appropriate rapport; anxious mood; appropriate affect; coherent speech; goal-directed thought content; not suicidal or homicidal; no gross cognitive defects; fair immediate, recent, and past memory
- assessments:
        - Axis I: GAD
        - Axis II: none
        - Axis III: head injury
        - Axis IV: financial issues
        - Axis V: 55
- plans: psychotherapy; intermittent psych assessment

3/11/08
- suicidality: none
- psychosis: none

4/8/08
- feeling good
- suicidality: none

- psychosis: none
<u>5/19/08</u>
- recently been irritable and angry
<u>6/18/08</u>
- feeling good; anxiety is under control; continues to have some confusion and memory problems

**<u>Medical Records, Dr. Landrio, Neurologic Associates, PLC 5/17/07 - 10/19/07 (Tr. 206-25, 254-71, 277-83, & 320-25)</u>**
<u>5/17/07</u>
- subjective: referred for treatment for tremors, panic attacks, anxiety, and depression; head tremors getting worse with increased uncontrolled movements; depression and panic attacks worsening
- review of systems:
> - general: fatigue
> - cardiovascular: no chest pain, claudications, fainting/blacking out, irregular heart beat, palpitations, shortness of breath, or swelling of extremities
> - musculoskeletal: joint pain but not back pain, muscle weakness, or swelling of extremities
> - neurological: decreased memory, difficulty speaking, dizziness, focal neurological symptoms, headaches, spinning sensation, tremor, unusual sensation and unsteadiness; no loss of consciousness or visual changes
> - psychiatric: anxiety, depression, hypersomnia, inability to concentrate, panic attacks; no change in sleep pattern, delusions, fearful, hallucinations, mood changes, insomnia, suicidal ideation, or suicidal planning
- neurological exam: alert, oriented, appropriate in conversation and able to give cogent and detailed history; able to recall 1 of 3 objects at 3 and 10 minutes; no paraphasic errors and neglected neither left nor right space; motor examination normal
- assessment: head titubations; muscle ontraction-tension headaches; subjective memory loss
- plan: MRI head; EEG; labs - dementia panel
<u>5/17/07 letter to Dr. Firdous</u>
- impression:
> - essential tremor
> - anxiety disorder
> - subjective memory loss in setting of remote closed head injury
> - muscle contraction - tension headaches
<u>5/22/07 EEG report</u>
- history: memory loss
- impression: normal EEG; no focal or paroxysmal epileptiform discharges were observed; no previous study available for comparison
<u>5/24/07 MRI report</u>
- clinical history: memory loss and tremor
- impression: multiple diffuse areas of scattered high signal ranging in different sizes throughout the periventricular while matter of the parietal lobes bilaterally. Concerned this represents demyclinating process - other possibilities include small vessel ischemic change, which is old

and less likely reactive gliosis. Believe reactive gliosis would be unlikely as there appears to be predominantly sparing of the frontal and occipital lobes. An infectious etiology such as Lyme's Disease could have this appearance as well

6/15/07
- subjective: follow-up for memory loss, tremors, and headaches; memory loss still an issue; only 1 migraine since starting Topamax
- review of systems:
    - general: fatigue present
    - cardiovascular: no chest pain, claudications, fainting/blacking out, irregular heart beat, palpitations, shortness of breath, or swelling of extremities
    - musculoskeletal: joint pain, no back pain, muscle weakness, or swelling of extremities
    - neurological: decreased memory, difficulty speaking, dizziness, focal neurological symptoms, headaches, spinning sensation, tremor, unusual sensation and unsteadiness; no loss of consciousness or visual changes
    - psychiatric: anxiety, depression, hypersomnia, inability to concentrate, panic attacks; no change in sleep pattern, delusions, fearful, hallucinations, mood changes, insomnia, suicidal ideation, or suicidal planning

10/19/07
- follow-up for memory loss, tremors, and headaches; one episode of tremors in a one-month period; headaches are much better; still having issues with confusion and memory loss while driving
- review of systems:
    - general: fatigue
    - cardiovascular: no chest pain, claudications, fainting/blacking out, irregular heart beat, palpitations, shortness of breath, or swelling of extremities
    - musculoskeletal: joint pain; no back pain, muscle weakness, or swelling of extremities
    - neurological: decreased memory, dizziness, focal neurological symptoms and unusual sensation; no difficulty speaking, headaches, loss of consciousness, spinning sensation, tremor, unsteadiness, or visual changes
    - psychiatric: no anxiety, change in sleep pattern, delusions, depression, fearful, hallucinations, hypersomnia, inability to concentrate, mood changes, insomnia, panic attacks, suicidal ideation, or suicidal planning

**Medical Record, Robert Foust, Winchester Medical Center, Inc., 5/24/07 (Tr. 307-09)**
- reason: memory loss/ tremor
- impression: multiple diffuse areas of scattered high signal ranging in different sizes throughout the periventricular white matter of the parietal lobes bilaterally. Concerned this represents demyelinating process; other possibilities would be small vessel ischemic change, which is old and less likely reactive gliosis. Reactive gliosis would be unlikely as there appears to be predominantly sparing of the frontal and occipital lobes. An infectious etiology such as Lyme's Disease could have this appearance as well

**Psychiatric/Psychological Impairment Questionnaire, Dr. Firdous, 7/13/07 (Tr. 244-53)**
- diagnosis of condition: generalized anxiety disorder; panic disorder

- DMS-IV multiaxial evaluation:
    - Axis I: generalized anxiety disorder
    - Axis II: none
    - Axis III: n/o head trauma in MVA
    - Axis IV: stress of being fired from job
    - Axis V: 50
    - highest GAF past year: 70
- prognosis: guarded
- positive clinical findings: poor memory; appetite disturbance with weight change; sleep disturbance; personality change; mood disturbance; emotional lability; recurrent panic attacks; anhedonia or pervasive loss of interests; psychomotor agitation or retardation; feelings of guilt/worthlessness; difficulty thinking or concentrating; social withdrawal or isolation; decreased energy; persistent irrational fears; generalized persistent anxiety
- primary symptoms: severe anxiety and panic attacks; memory deficits
- understanding and memory:
    - ability to remember locations and work-like procedures: markedly limited
    - ability to understand one or two step instructions: no evidence of limitation
    - ability to understand and remember detailed instructions: markedly limited
- sustained concentration and persistence:
    - ability to carry out simple one or two-step instructions: no evidence of limitation
    - ability to carry out detailed instructions: markedly limited
    - ability to maintain attention and concentration for extended periods: markedly limited
    - ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance: markedly limited
    - ability to sustain ordinary routine without supervision: markedly limited
    - ability to work in coordination with or proximity to others without being distracted by them: markedly limited
    - ability to make simple work-related decisions: markedly limited
    - ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods: markedly limited
- social interactions:
    - ability to interact appropriately with the general public: markedly limited
    - ability to ask simple questions or request assistance: mildly limited
    - ability to accept instructions and respond appropriately to criticism from supervisors: markedly limited
    - ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes: mildly limited
    - ability to maintain social appropriate behavior and to adhere to basic standards of neatness and cleanliness: mildly limited
- adaption:
    - ability to respond appropriately to changes in the work setting: markedly limited
    - ability to be aware of normal hazards and take appropriate precautions: no evidence of limitation

- ability to travel to unfamiliar places or use public transportation: markedly limited
- ability to set realistic goals or make plans independently: markedly limited
- capable of tolerating low stress - not been able to follow instructions in doing simple household work

**Physical Residual Functional Capacity Assessment, Dr. Osborne, 8/22/07 (Tr. 236-43)**
- primary diagnosis: mild essential tremor
<u>Exertional Limitations</u>: none
<u>Postural Limitations</u>: none
<u>Manipulative Limitations</u>: none
<u>Visual Limitations</u>: none
<u>Communicative Limitations</u>: none
<u>Environmental Limitations</u>: none
<u>Symptoms</u>:
- ADLs - no self-care deficits; able to complete all hh tasks except laundry w/o assistance/ able to drive and shop; states unable to lift, hold or grasp objects due to tremors;
- credibility: poor; objective MER shows "mild essential tremor" with normal strength and coordination with no drift

**Mental Status Examination, Harry Wood, WV Disability Determination Service, 10/11/07 (Tr. 272-76)**
- chief complaints: memory loss, anxiety, difficulty in working with papers; nervous
- presenting symptoms: panic disorder with significant shaking of her head, heart palpitations, hyperventilation, nausea, lack of reality; generalized anxiety disorder where she is tense all the time, has excessive problems with worry, has sleep disturbances, and is unable to relax
- mental status examination: observed head tremor; cooperative; clear speech; oriented x4; mood appeared markedly anxious; broad affect; thought stream appeared to be well-organized; no evidence of delusions, phobias, or obsessions; illusions and hallucinations not present; insight was fair; average judgment; no suicidal or homicidal ideations; immediate memory within normal limits; recent memory moderately deficient; remote memory within normal limits; concentration mildly deficient; task persistence within normal limits; pace within normal limits
diagnoses:
    - Axis I: 300.01 panic disorder without agoraphobia
    - Aix I: 300.02 generalized anxiety disorder
    - Axis II: V71.09 no diagnosis
    - Axis III: history of traumatic brain injury per claimant
- prognosis: fair
- capability: competent to manage own financial affairs

**Mental Residual Functional Capacity Assessment, Joseph Kuzniar, Ed.D., 10/16/07 (Tr. 285-88)**
<u>understanding and memory</u>
- ability to remember locations and work-like procedures: not significantly limited
- ability to understand and remember very short and simple instructions: no evidence of

limitation
- ability to understand and remember detailed instructions: not significantly limited
sustained concentration and persistence
- ability to carry out very short and simple instructions: no evidence of limitation
- ability to carry out detailed instructions: not significantly limited
- ability to maintain attention and concentration for extended periods: not significantly limited
- ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances: moderately limited
- ability to sustain an ordinary routine without special supervision: no evidence of limitation
- ability to work in coordination with or proximity to others without being distracted by them: moderately limited
- ability to make simple work-related decisions: no evidence of limitation
- ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods: moderately limited
social interaction
- ability to interact appropriately with the general public: not significantly limited
- ability to ask simple questions or request assistance: no evidence of limitation
- ability to accept instructions and respond appropriately to criticism from supervisors: moderately limited
- ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes: moderately limited
- ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited
adaption
- ability to respond appropriately to changes in work setting: moderately limited
- ability to be aware of normal hazards and take appropriate precautions: no evidence of limitation
- ability to travel in unfamiliar places or use public transportation: not significantly limited
- ability to set realistic goals or make plans independently of others: not significantly limited
functional capacity assessment: MRFC ratings show capacity to understand somewhat complex instructions with the capacity to remember and therefore to carry out instructions being at the 1-3 step level.  Capacity for managing social interaction demands is at low demand level.  Does not have capacity to return to prior place of employment due to anxiety associated with contact with ex-boss.  Capacity for adaption is mildly to moderately reduced

**Psychiatric Review Technique, Joseph Kuzniar, Ed.D., 10/16/07 (Tr. 289-302)**
Medical Disposition: RFC Assessment necessary
categories upon which the medical disposition is based:
- 12.02 organic mental disorders - subjective memory loss
- 12.04 affective disorders - depression
- 12.06 anxiety-related disorders - anxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms, as evidenced by at least one of the following:
         - generalized persistent anxiety accompanied by three of the following:

13

- motor tension,
    - autonomic hyperactivity
    - apprehensive expectation
  - and panic disorder without agoraphobia
functional limitations
- restriction of activities of daily living: moderate
- difficulties in maintaining social functioning: moderate
- difficulties in maintaining concentration, persistence, or pace: mild
- episodes of decompensation, each of extended duration: one or two
C criteria: evidence does not establish C criteria

**Physical Residual Functional Capacity Assessment, Dr. Lambrechts, 1/7/08 (Tr. 334-41)**
primary diagnosis: head and neck tremors
secondary diagnosis: arthralgias R.O. fibromyalgia
exertional limitations:
- occasionally lift: 50 pounds
- frequently lift: 25 pounds
- stand and/or walk (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- sit (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- push and/or pull (including operation of hand and/or foot controls): unlimited
postural limitations:
- climbing ramp/stairs: frequently
- climbing ladder/rope/scaffolds: occasionally
- balancing: occasionally
- stooping: frequently
- kneeling: occasionally
- crouching: occasionally
- crawling: occasionally
manipulative limitations: none
visual limitations: none
communicative limitations: none
environmental limitations:
- extreme cold: avoid concentrated exposure
- extreme heat: avoid concentrated exposure
- wetness: unlimited
- humidity: unlimited
- noise: unlimited
- vibration: avoid concentrated exposure
- fumes, odors, dusts, gases, poor ventilation: unlimited
- hazards: avoid concentrated exposure
comments: reduced her RFC to medium

**Multiple Impairment Questionnaire, Dr. Botros, 3/31/08 (Tr. 342-49)**
- diagnosis: fibromyalgia; chronic fatigue; anxiety/depression; irritable bowel syndrome; asthma

- prognosis: guarded
- clinical findings: positive fibromyalgia prints
- lab and diagnostic test results: no lab diagnosis
- significant limitations in doing repetitive reaching, handling, fingering, and lifting
- degree of limitation using upper extremities in 8-hour workday:
    - grasping, turning, twisting objects: moderate
    - using fingers/hands for fine manipulations: no limitations
    - using arms for reaching: marked
- incapable of even low stress
- will need to take breaks throughout a workday
- other limitations affecting patient's ability to work at a regular job on sustained basis: psychological limitations; need to avoid noise, fumes, gases, humidity, dust, and heights; no pushing, pulling, kneeling, bending, or stooping

**Fibromyalgia Impairment Questionnaire, Dr. Botros, 3/31/08 (Tr. 350-56)**
- other diagnosed impairments: irritable bowel syndrome; anxiety, depression, PTSD; asthma; high cholesterol
- prognosis: guarded
- clinical findings: tension spots in neck, shoulder, elbows, lower back, hips, knees
- lab and diagnostic test results: fibromyalgia is a clinical diagnosis - no lab results
- symptoms: fatigue; tiredness; weakness; pain in back of head, neck, shoulders, back; muscle aches; tender muscles
- frequency: symptoms may persist for approximately 6 months before improving
- in an 8-hour workday, patient can:
    - sit for 3 hours
    - stand/walk for 2 hours
- in an 8-hour workday, patient must move around every 1-2 hours and can sit again after 10-15 minutes
- lifting:
    - 0-5 lbs: occasionally
    - 5-10 lbs: occasionally
    - 10-20 lbs: never
    - 20-50 lbs: never
    - over 50 lbs: never
- carrying:
    - 0-5 lbs: occasionally
    - 5-10 lbs: never
    - 10-20 lbs: never
    - 20-50 lbs: never
    - over 50 lbs: never
- incapable of even low stress jobs
- other limitations: psychological limitations; no pushing, pulling, kneeling, bending, stooping; need to avoid noise, fumes, gases, humidity, dust, heights

**Letter from Dr. Firdous, 5/23/08 (Tr. 357)**
- anxiety continues to be severe despite treatment with psychotherapy and medication
- prognosis is guarded - response has been poor and she continues to have severe limitations on her activities

**Multiple Impairment Questionnaire, Dr. Botros, 12/11/08 (Tr. 370-78)**
- diagnosis: anxiety, depression, fibromyalgia, irritable bowel syndrome, asthma
- prognosis: guarded
- clinical findings: positive fibromyalgia trigger points
- lab and diagnostic test results: no lab diagnosis
- primary symptoms: fatigue: tiredness; weakness; pain in back of neck, shoulders, and back
- frequency of pain: constant
- functional capacity:
> - in an 8-hour workday, can sit 3 hours
> - in an 8-hour workday, can stand/walk 2 hours
> - necessary not to sit continuously
> - must get up and move around every few hours
> - cannot stand/walk continuously in the work setting
- lifting:
> - 0-5 lbs: occasionally
> - 5-10 lbs: occasionally
> - 10-20 lbs: never
> - 20-50 lbs: never
> - over 50 lbs: never
- carrying:
> - 0-5 lbs: occasionally
> - 5-10 lbs: never
> - 10-20 lbs: never
> - 20-50 lbs: never
> - over 50 lbs: never
- significant limitations doing repetitive reaching, handling, fingering, and lifting
- grasping, turning, twisting objects: moderate
- using fingers/hands for fine manipulation: no limitations
- using arms for reaching: marked
- incapable of even low stress jobs
- will need to rest at unpredictable intervals during an 8-hour workday
- other limitations: psychological limitations; need to avoid noise, fumes, gases, humidity, dust, heights; no pushing, pulling, kneeling, bending, stooping

D.      Testimonial Evidence

        Testimony was taken at the hearing held on January 14, 2009.  The following portions of

the testimony are relevant to the disposition of the case:

16

EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q      Ms. Keller can I have you state your name for the record.
A      Joan Kathleen Keller.
Q      All right, what's your date of birth?
A      2/17/49.
Q      And your current age?
A      I am 59; I'll be 60 next month.

          *          *          *

Q      How far did you go in school?
A      I have my master's degree.  It's called a master's equivalency.
Q      And you can read and write?
A      Oh yes.
Q      And do simple math?
A      Oh yes.

          *          *          *

Q      Are you currently working?
A      No.
Q      All right, when was the last time that you worked?
A      The last day was September 30, 2006.
Q      And where were you working at that time?
A      Cascade Elementary in Maryland, Washington County, Maryland.
Q      How long had you worked there?
A      Six years.
Q      And why did you stop?
A      I had a nervous breakdown.
Q      Were you hospitalized?
A      No, but I was taken care of by a doctor.
Q      Had you been under that doctor's care before that?
A      Yes, he was my family physician.
Q      Was that - - September 30th was that at the beginning of a new school year?
A      Yes.
Q      Okay, what grade did you teach?
A      I was teaching second grade.
Q      Your attorney mentioned that you have anxiety attacks.
A      Yes, ma'am.
Q      Different people experience those differently.  Can you try to describe those and give me a feel for what that's like for you?
A      Well when they start to come on I have been under some kind of stress, usually mental stress, worry.  The anxiety attacks usually start, I feel them in my feet first.  My legs become numb and I can't walk.  I have to sit down usually.  If I'm in a car, I have pull over to the side of the road and give myself half an hour perhaps for it to go away.  Sometimes I'll just have to sit down and try to let it go away.  Sometimes it'll take 30 minutes.  But if I can, I go outside, walk a little bit, try to get into a different environment; anything to get away from that

stress, whatever is causing it.  I will try to get away from it.  Sometimes if I go outside and walk a little bit if I can, that will also help.  And often I will just have to go to bed.

Q        What sort of stressors are things that might cause one of these attacks to happen?

A        Any time I am certain that - - well like right now.  It's difficult for me to speak, difficult to make complete sentences sometimes.  It's very difficult for me to explain when I - - especially now when I'm going through one.  A new situation will prompt one to come on.  Anything unexpected will cause one, any kind of loud noise, controversy, for example.  Something unexpected, something like this, even though I can plan for it I still can't keep it from coming on and if I know something is going to happen and I can plan I will take a Klonopin.  My doctor told me in a situation like that to take a Klonopin and it will actually help some.  But - -

Q        How often - - I'm sorry, how often do you have these anxiety attacks?  Is it on a sort of regular basis or it comes and goes?

A        I try to keep myself from being in a situation for it to happen.  If I know a situation's coming up that will cause one I will stay away from it.  I sometimes have trouble explaining myself.

Q        Do you have family in the area who you visit with?

A        Yes my two sons and my daughter live in Martinsburg.

Q        And do they help you out with anything?

A        My daughter does.  She is - - she does not work full-time.  She's an insurance agent.  She works part-time and I help with the little boy maybe once a week, maybe once every two weeks and my son is married, one son is married.  He has a little boy.  He works full-time so he has a lot of responsibilities there.  My other son is a senior at Sheppard University and he'll come over two or three times a week perhaps.  But he has a lot of responsibilities working full-time and going to school full-time.

Q        Your daughter who has the child who you watch sometimes, how old is the child?

A        The child's two and then she has a ten year old.

Q        And do you sometimes watch either of the children while she's working?

A        I had been for a while but it was too hard on me to have him all of the time so she works from home now and she takes care of him there.

Q        Was there a time when you tried watching the two year old on a full-time basis?

A        Yes, yes and it was very very - - he is a wonderful child, very responsive, very busy and very intelligent but it was difficult to keep him because I would get extremely tired and he would still be very active.  So in order for me to cope I just sat on the floor.

Q        How long was it that you tried watching him for?

A        Ten months.

Q        When was that?

A        '07 and part of '08.

Q        And did you keep doing that until her job changed and she didn't sort of need you on a full-time basis anymore?

A        She, her job didn't really change.  She stopped working full-time because she knew it was too hard on me and she could get part of that work done at home.

Q        At your house, who is the one responsible for paying the bills?

A        My husband and I both do.  We have our own set of bills that we pay.

Q        So you're responsible for making sure your bills are paid?

A      My husband pays a certain set of bills.

Q      Okay.

A      And I pay a certain set of bills.

Q      Okay, that makes sense.  Where do you do your shopping?

A      Martinsburg or Shepherdstown, close by?

Q      How do you usually get there?

A      I drive a short distance.  I can drive that far.

Q      Are there some places that you won't drive to?

A      I have not driven to see my mother.  She lives 200 miles away and I don't think it's safe for me to drive and my doctor doesn't want me to drive that far.  So, whenever my husband has a day or two off from both jobs we'll go see my mother.  She's 85, dad's 85.  If it's a different, if it's some place I've never been before I generally don't drive.  I used to drive any place but not anymore.

Q      When did you start to limit where you were driving?  Do you remember what year that happened?

A      As soon as this nervous break down happened in '06, September '06.

Q      Since that break down in '06, do you think your condition has improved, gotten worse, stayed the same, gone up and down?

A      It has improved for the most part it has improved in about the first 18 months.  A lot of that has improved a lot of the brain damage and the doctor called it organic brain damage.  Some of that has improved but then whenever I have an attack it goes back to the way it was before like an anxiety attack.

Q      The medications that you are taking, do they cause you any side effects?

A      Yes.

Q      What kind of side effects?

A      Well the worse one is the Klonopin causes memory problems.  It does help to relax me, but it causes memory problems and that was one the doctor wanted me to get off of.  I was taking one for the tremors but it caused terrible nightmares and it wasn't - - I would rather have the tremors than have those terrible nightmares.

Q      Any other side effects from the medications?

A      Well I had a lot of stomach pain.

Q      You mentioned tremors, can you describe those to me?

A      Shaking.

Q      Where?

A      From the back of the neck and head.  My hands do not shake like they used to but my head and my neck.

Q      How often does that happen?

A      Daily.

Q      Has it been daily consistently since '06?

A      Yes.

Q      Have there been any time periods where those symptoms have resolved or gotten better?

A      Whenever I am - - generally if I'm outside, if I am doing something I really enjoy doing, especially outside.  If I'm in the garden or in the flower beds, I usually don't have it.  But

whenever I read, whenever I try to concentrate, whenever I'm under stress it gets worse.

Q    What's the longest period of time you think you've gone without having any tremors or any significant tremors?

A    Maybe two hours, outside, if I'm outside in the garden for example.

Q    So that longest you can go without any significant tremors is two hours?

A    Maybe two hours; I would say about two hours.

Q    Do they know what's causing that?

A    I don't.  I'm sure my doctor does.  I don't know.

Q    Your doctor said in 2007, she states that a tremor is very low on impletude and involved head titubation and occurs on rare occasions which she believes she can control voluntarily.  Is that an accurate statement by your doctor and I'm sorry counsel this is 9F at three?

A    If I am sitting down and reading for example and I notice it stop - - it starts I can put my hands up to my face and try to concentrate on something else for a while and then try to make it go away, yes.  But if I am having an attack for example it's very difficult to control that.

                    *                    *                    *

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q    Ms. Keller I see that there's some notation to - - there was a fibromyalgia impairment questionnaire filled out by Dr. Botrose (Phonetic).

A    Uh huh.

Q    Do you currently suffer with that impairment as well?

A    Yes, yes.

Q    Can you please describe to us your symptom?

A    Fibromyalgia it, to me is a great deal of muscle tenderness in my head, my neck, my shoulders, back and sometimes my arms and legs and it's a very aching pain.

Q    And how often do you experience this pain?

A    Whenever I'm under a great deal of stress.  It takes a few days, it'll build up and then it'll just have a terrible ache.

Q    And are you currently on any medication for this?

A    No, I tried medication but it was, caused stomach bleeding.

ATTY    No further questions, Your Honor.

ALJ    All right, thank you.  We're going to go to the - - well let me ask you just one more time so I make sure I pick anything up.  What types of - - because you mentioned stress a lot of times but that's so different for different people, are there things about a work environment that you would find particularly stressful?

CLMT    I have trouble with being social in a socialized situation, saying the wrong things, hurting people's feelings and having been a teacher for so long I as always; I always tried to be kind to students.  In a situation now I'm not always kind.  I sometimes, even my daughter-in-law, I hurt her feelings and that would be the last thing I would ever do.  My son-in-law I have hurt his feelings before, since this situation came up and I'm not always in control of things that I want to say.  They don't always come out the way I want them to come out and I'm not sure if - - I just have a hard time expressing, expressing what I want to say sometimes.  I apologize for that.

                    *                    *                    *

REEXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q        I think that's where we were too talking about social situations.  Do you belong to any clubs or organizations, go to church, go to meetings of any sort?

A        No, no.

Q        Have you ever done that?

A        Yes.

Q        When did you stop?

A        When this occurred.  Several of my friends, teacher friends, have called want me to meet them for lunch or join a knitting club or a quilting club for example and I just have to tell them I'd rather not.

Q        How come?

A        I don't feel comfortable.

Q        Do you have any friends that you go out with?

A        My family.

Q        When you were watching your grandchild would you take him out places?

A        I would try, yes.  We would - - I would take him to the park everyday, put him the stroller and take him to the park for example.

Q        Is there a park near by that you can walk to?

A        I would go to his house sometimes and the park is about three blocks away.  We live on a farm and I would take him out and we'd play in the fields for example.

                              *              *              *

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q        And will you let me know if your testimony at any point differs with the DOT?

A        Yes.

Q        All right, can you give me a vocational assessment of the claimants past work?

A        Yes, Your Honor.  In the <u>Dictionary of Occupational Titles</u> teacher is listed elementary and that's classified as light, SVP seven.  Seven is a skilled position.  I do not know if you could count babysitter, but babysitter is in there and it's medium, three.  I don't think it was SGA but three is semi-skilled on the lower level.

Q        Would she - - those are all of the jobs?

A        Yes.

Q        Would she have any skills transferable to the sedentary level?

A        No.

Q        Let me ask you a hypothetical about a person the claimant's age, education and work experience.  We'll start with the DDS limit which is medium although you can certainly go below that if you would like.  Somebody who can do routine tasks with few workplace changes, frequent but not constant fingering and handling, no unexpected loud noises, no heights, ladders or hazardous conditions.  If those were the only limitations could the person return to the claimant's past work?

A        Generally, Your Honor a teacher's role is set in the routine because they go by a teaching plan they develop each day pertaining to what they have their expectations, loud noises could be children unless you have them under control, that's hard to say, but - -

Q        I would think with smaller children that you can plan your routine but you can not

control theirs.

A       This is true.  I would say no because second grade, I have taught school and I know that can be very up and down.  I taught first and second grade so I think so, I think that, that it could change and loud noises kids do squeal and scream and even if you have them under control.  I would say no.

Q       Would there be other jobs with those limitations available that could be done?

A       At what exertion?

Q       Up to medium.

A       Up to medium, yes I can identify other jobs.  Your Honor the kind of jobs I would identify would be, to keep it routine, I could to entry level all the way up to SVP three.  Three is semi-skilled, but at a lower level which takes just on the job training.  Just to give you some examples, Your Honor I would look at interviewer.  That's a light SVP two, entry level.  There's almost 106,000 nationally and in Maryland, 1,800.  Also, information clerk, light, SVP two; 80,000 nationally and 1,900 in Maryland and an office clerk, light, SVP two level; 294,000 and 6,300 in Maryland.

Q       In any of these jobs would the person have significant responsibility for decisions that were made?  You know would they be making decisions about whether somebody was entitled to something?

A       Not at SVP two, no.

Q       Okay, so in terms of their responsibilities, they might be responsible for, and please correct me if I'm wrong, but for providing information or passing it along but not necessarily for acting on it?

A       Correct, SVP two is very low level, entry level, just doing the job.

Q       Okay and those were all at the light level?

A       Yes.

Q       Okay what if somebody had trouble interacting with other people and needed a limitation where they were not interacting with the general public or at least nothing more than occasional basis?

A       Well interviewer would interacting with at least one other person because you're interviewing or taking information and putting it on a computer system or on a piece of paper.  An information clerk would be giving information one on one either by the phone or if someone comes up the desk.

Q       Would there be other jobs that wouldn't involve such regular interaction with the general public?

A       Yes, I have a medium, SVP two which is assembler.  There would be no public or others except co-workers who are doing their job.  Responsibility would be at minimum because it's SVP two.

Q       Would that require constant fingering or handling?

A       Yes it would, assembler, yes.  Let me take a look and see what else I have.  I do have also an order filler.  That's marketing items at the back of the store, just putting price tags on things, light, SVP two, 225,000 nationally and 4,100 in Maryland.  That would be no public.  Also at light, SVP two that would be no public that would be routine and very little responsibility would be like a maid at a hotel, light SVP two, 300,000 nationally and 4,500 in Maryland and a medium level, a hospital cleaner. Which is basically doing the same type of

work except at a hospital, medium, SVP two, 300,000 nationally and 4,500 in Maryland.

Q     So is it this the same numbers for the light and the medium?

A     Yes.

Q     Are those the same jobs or are they different?

A     They're different only because of the lifting, medium and light. Hospital cleaners have to sometimes lift heavier things. They have to move the beds even though they're on wheels and push them aside to clean the room.

Q     If somebody was going to miss work for more than three times a month would that affect their ability to do these jobs?

A     Yes, the rate of absenteeism that I use is one and a half to two days a month after occurring time. So, three is exceeding the one and a half to two.

ALJ     All right counsel I'm going to let you go ahead.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q     Just one more question, Ms. Martindale, assume someone had - - could only sit and stand, sit, stand and walk for a total of five out of an eight hour day. Would this limit any of the jobs that you've named?

A     Yes, I identify eight hour jobs so that's less than full-time.

*       *       *

E.     <u>Lifestyle Evidence</u>

The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how Claimant's alleged impairments affect her daily life:

- helps look after her grandson once per week (Tr. 33)
- is able to pay bills (Tr. 34, 125)
- does not pay her own bills (Tr. 156)
- is able to drive to places she knows (Tr. 34, 125, 156)
- does not drive long distances (Tr. 34)
- is able to go shopping for groceries and clothing (Tr. 34, 125, 154)
- has tremors daily (Tr. 35-36)
- has trouble socializing (Tr. 39, 126)
- cannot always control what she says (Tr. 40)
- does not belong to any social organizations (Tr. 40-41)
- packs her husband's lunch (Tr. 122)
- takes care of plants (Tr. 122)
- prepares meals daily (Tr. 122, 124, 154, 155)
- reads (Tr. 122, 126, 155)
- takes care of two dogs (Tr. 123)
- can no longer run 25 miles/week (Tr. 123)

- does not sleep well (Tr. 123)
- no problems with personal care (Tr. 123, 155)
- needs a reminder to take medication (Tr. 124)
- is able to do housework including sweeping, mopping, loading the dishwasher, changing bed linens, light house cleaning (Tr. 124, 154)
- goes outside everyday (Tr. 125)
- is able to count change, handle a savings account, and use a checkbook and money order (Tr. 125)
- does not handle her own money (Tr. 156)
- has trouble making decisions because of memory problems and spends too much money (Tr. 126)
- hobbies include reading, sewing, running, canoeing, traveling, and baking, but Claimant has lost interest (Tr. 126)
- does not participate in her hobbies anymore except reading (Tr. 126)
- no longer goes to football or soccer games (Tr. 126)
- goes out to dinner twice/week (Tr. 126)
- has no problems getting along with family, friends, neighbors and others (Tr. 127)
- can walk only a quarter of a mile before needing to rest for 20-25 minutes and beginning again (Tr. 127)
- can only pay attention for 2 minutes (Tr. 127)
- does not finish what she starts (Tr. 127)
- does not follow written or spoken instructions well (Tr. 127)
- gets along well with authority figures (Tr. 128)
- does not handle stress well (Tr. 128)
- does not vacuum (Tr. 154)
- does not mow the grass (Tr. 154)
- does the laundry (Tr. 154)
- watches television (Tr. 155)
- gardens (Tr. 155)
- walks for 30 minutes four times/week (Tr. 155)
- sews and mends as needed (Tr. 155)
- visits her parents every three months (Tr. 156)
- rarely visits with friends (Tr. 156)
- sees family multiple times each week (Tr. 156)
- attends family reunions once each year (Tr. 157)
- takes naps during the day (Tr. 122, 157)

### III. The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant argues that the ALJ erred by determining she is not disabled under Listings

12.04 and 12.06.  Additionally, Claimant argues that the ALJ failed to follow the treating

physician rules and afford appropriate weight to Claimant's treating physicians, relied upon flawed vocational evidence at Step 5 of the disability analysis, and failed to properly evaluate Claimant's credibility.

Commissioner contends that the ALJ correctly concluded that Claimant's mental impairments did not satisfy the requirements of either Listing 12.04 or Listing 12.06. Additionally, Commissioner contends that the ALJ properly gave little weight to the respective opinions of Claimant's treating physicians, substantial evidence supports the ALJ's RFC Assessment and hypothetical question, and the ALJ correctly found Claimant's subjective complaints were not entirely credible.

B.  <u>Discussion</u>

1.  Whether the ALJ Erred by Concluding that Claimant's Impairments did not Meet the Requirements of Listings 12.04 and 12.06.

Claimant argues that the ALJ erred by not finding Claimant disabled according to either Listing 12.04 or 12.06. Specifically, Claimant argues that the ALJ erred by failing to discuss the "A" criteria of either Listing and that Claimant indisputably satisfies the "A" criteria of either Listing. Additionally, Claimant argues that the ALJ's discussion of the "B" criteria is insufficient and, specifically, to the ALJ's "B" criteria findings: no evidence supports the ALJ's assumption that Claimant is able to get along with authority figures; Claimant's ability to engage in activities of daily living does not speak to her ability to maintain concentration, persistence, and pace on a daily basis; and, contrary to the ALJ's statement, the Listings do not require a "nervous breakdown" to evidence decompensation.

Commissioner contends that the ALJ properly determined Claimant's mental impairments did not satisfy the criteria of either Listings 12.04 or 12.06. Specifically, the

Commissioner argues that the medical evidence does not support Claimant's assertion that her mental impairments satisfy the listings.

It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner. Id.; see also, 42 U.S.C. §§ 405(g), 1383(c)(3) (West 2010). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays, 907 F.2d at 1456. "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 664-65 (1988); see also Richardson v. Perales, 402 U.S. 389, 401 (1971). The decision before the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)).

In evaluating disability, the ALJ must apply a five-step analysis. At step two, an ALJ must evaluate the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable mental impairment." 20 C.F.R. § 404.1520a(b)(1) (West 2010). If the claimant has a medically determinable mental impairment, the ALJ "must then rate the degree of functional limitation resulting from the impairment(s)" with respect to "four broad functional areas": "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." Id. at §§ 404.1520a(b)(2). At step three,

the ALJ must determine whether the claimant's impairments "meets or is equivalent in severity to a listed mental disorder." Id. at § 404.1525a(d)(2). Claimants who meet the requirements of a listed impairment will be deemed conclusively disabled. Rabbers v. Commissioner Social Sec. Admin., 582 F.3d 647, 653 (6th Cir. 2009). "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530 (1990).

Listing 12.04 Affective Disorders requires that the claimant suffer from a "disturbance of mood, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04 (West 2010). To meet the required level of severity, the claimant's impairments must meet both A and B or satisfy the requirements of C. Id. To satisfy part A, the claimant must present medically documented persistence, either continuous or intermittent, of depressive syndrome, manic syndrome, or bipolar syndrom with a history of episodic periods. Id. The requirements of B are satisfied by showing two of the following: "marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and repeated episodes of decompensation, each of extended duration." Id. The requirements of C are met by demonstrating "[m]edically documented history of chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medial or psychosocial support, and". . . "repeated episodes of decompensation", "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the

environment would be predicted to cause the individual to decompensate", or "current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." Id.

Listing 12.06 Anxiety Related Disorders is characterized by anxiety as "either the predominant disturbance or it is experienced if the individual attempts to master symptoms . . . ." 20 C.F.R. pt. 404, subpt. P, app.1, § 12.06 (West 2010). "The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied. Id. The requirements of A are met by generalized persistent anxiety; persistent irrational fear of a specific object, activity, or situation, which results in a compelling desire to avoid it; recurrent severe panic attacks; recurrent obsessions or compulsions; or recurrent and intrusive recollections of a traumatic experience. Id. The requirements of B are met by demonstrating two of the following: "marked restriction of activities of daily living"; "marked difficulties in maintaining social functioning"; "marked difficulties in maintaining concentration, persistence, or pace"; and "repeated episodes of decompensation, each of extended duration." Id. C is met when the claimant is completely unable "to function independently outside the area of one's home." Id.

In her decision, the ALJ found Claimant suffered from the following severe medically determinable impairments: fibromyalgia/arthralgia, essential tremors, affective disorder, and anxiety disorder. (Tr. 16). However, the ALJ found that Claimant's severe mental impairments did not meet the requirements of either Listing 12.04 or 12.06. (Tr. 17-18). The Court must agree with the ALJ.

The ALJ turned first to the "B" criteria, which is the same under both Listings, and found

that Claimant's impairments did not satisfy the requirements. First, the ALJ found that Claimant's ability to engage in activities of daily living was only mildly restricted. To support this determination, the ALJ cited Claimant's ability to care for her own personal needs and family pets, do light household chores, prepare meals, drive, shop, garden, exercise, sew, and babysit. (Tr. 17). Second, the ALJ found that Claimant had only mild difficulties with social functioning because Claimant "gets along with other authority figures and with others, shops weekly, goes out to dinner, visits with family members, and considers her social skills as average." (Id.). Third, with regard to concentration, persistence, and pace, the ALJ reported that Claimant states she has moderate difficulties; however, Claimant is able to sew, play cards, watch television, read two to three hours each day, and manage her own finances. (Id.), Finally, as for episodes of decompensation, the ALJ found that Claimant experienced one to two episodes of decompensation, each of extended duration. Besides the nervous breakdown on the alleged onset date of disability secondary to problems with her former boss, the ALJ found no evidence of further decompensations and no evidence suggesting Claimant required any inpatient psychiatric hospitalizations. (Id.).

The ALJ then turned to the "C" criteria and found that it also was not satisfied because Claimant's symptoms responded to medications. (Tr. 18).

Claimant argues that the ALJ erred by failing to discuss the "A" criteria. However, to satisfy Listing 12.04, the Claimant's mental impairments had to meet both the "A" and "B" criteria or the "C" criteria, and to satisfy Listing 12.06, the Claimant's mental impairments had to meet both the "A" and "B" criteria or the "A" and "C" criteria. The ALJ determined that the Claimant did not meet the "B" or "C" criteria under either Listing. Therefore, any analysis of

the "A" criteria by the ALJ would have been moot because a positive determination of the "A" criteria alone is insufficient for a finding of disability.

Claimant also argues that the ALJ's conclusion that Claimant is able to get along with authority figures is not supported by evidence. The ALJ cites to the record several times to support her contentions; moreover, Claimant provides no evidence contradicting the determination. The ALJ's determination is supported by substantial evidence, and Claimant's contention is meritless. Additionally, Claimant's contention that the ALJ erred because the Listings do not require a nervous breakdown to evidence decompensation is meritless. The ALJ did not fail to find Claimant suffered from episodes of decompensation strictly because Claimant suffered from only one nervous breakdown. Rather, the ALJ stated that "there is no evidence of further decompensations and no evidence that she required any inpatient psychiatric hospitalizations." (Tr. 17). The ALJ did not base his decision solely on the nonexistence of nervous breakdowns.

Finally, Claimant argues that her ability to engage in activities of daily living does not bear on her ability to maintain concentration, persistence, or pace on a daily basis. "Concentration, persistence, or pace" refers to the "ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04 (West 2010). Though limitations are "best observed in work settings, [they] may also be reflected by limitations in other settings." Id. Though it is unclear from the Regulations whether activities of daily living can be used to determine a Claimant's impairments in concentration, persistence, or pace, Claimant provides no authority to the contrary - only a bald assertion that "the fact that

[Claimant] could engage in marginal daily activities such as sewing, playing cards, watching TV, and reading for unspecified periods of time says nothing of her ability to maintain concentration, persistence, and pace on a daily basis."[5]

It is not the job of the Court to determine fact, but only to determine that the ALJ properly followed the law. Contrary to the contentions of Claimant, the ALJ cited numerous medical reports and other evidence to sufficiently support her conclusion that Claimant's impairments did not meet the requirements of either Listing 12.04 or 12.06. Therefore, there was substantial evidence for the ALJ to find that Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, 1. Accordingly, the ALJ did not err.

2.      Whether the ALJ Gave Appropriate Weight to the Medical Evidence Submitted by Treating Physicians

Claimant argues that the ALJ failed to give proper weight to the opinions of Drs. Botros and Firdous. Specifically, Claimant argues that the ALJ erred by finding that the opinions of Drs. Firdous and Botros should not be given controlling weight but only some weight because the opinions were inconsistent with treatment records and Claimant's admitted daily activities. Additionally, Claimant argues that the ALJ erred by failing to indicate whether she considered any of the treating physician factors set forth in Hines. Finally, Claimant argues that the ALJ erred by giving the opinions of the non-examining state agency medical and psychological consultants significant weight.

Commissioner contends that the ALJ followed the regulations and properly did not give

---

[5] Dkt. No. 19-1, P. 14.

the opinions of Drs. Firdous and Botros controlling weight because they were unsupported by medical evidence and inconsistent with other substantial evidence in the record.

All medical opinions are to be considered in determining the disability status of a claimant. 20 C.F.R. §§ 404.1527(b), 416.927(b) (West 2010). Nonetheless, opinions on ultimate issues, such as RFC and disability status under the regulations, are reserved exclusively to the ALJ. 20 C.F.R. §§ 404.1527(e)(1)-(3), 416.927(e)(1). Statements by medical sources to the effect that a claimant is "disabled" are not dispositive, but an ALJ must consider all medical findings and evidence that support such statements. Id. The opinion of a claimant's treating physician is entitled to great weight and may only be disregarded if there is persuasive contradictory evidence. Evans v. Heckler, 734 F.2d 1012, 1015 (4th Cir. 1984). Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources, when the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. §416.927(d)(2) (West 2010); see Craig, 76 F.3d at 590 (holding that a treating physician's medical opinion must be given controlling weight only when it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record).

While the credibility of the opinions of the treating physician is entitled to great weight, it may be disregarded if there is persuasive contradictory evidence. Evans, 734 F.2d at 1015. To decide whether the impairment is adequately supported by medical evidence, the Social Security Act requires that impairment, physical or mental, be demonstrated by medically acceptable

clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Heckler v. Campbell, 461 U.S. 458, 461 (1983); 20 C.F.R. §§ 404.1508; Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990). Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a specialist. 20 C.F.R. § 404.1527(d) (West 2010); see also, Hines v. Barnart, 453 F.3d 559, 563 (4th Cir. 2006). Courts often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). However, "although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." Id. (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).

Dr. Botros

Claimant argues that the ALJ improperly gave only some weight to Dr. Botros's opinion upon finding it was inconsistent with the objective findings on examination, Claimant's response to treatment, the episodic nature of her symptoms, and Claimant's admitted daily activities. Claimant argues this was error because the ALJ focused only on the remission periods. Additionally, Claimant argues that there is no persuasive contrary evidence to contradict Dr. Botros's opinion that Claimant would be unable to perform even sedentary work requirements. Finally, Claimant argues that remand is necessary because the ALJ failed to analyze the factors

set forth in <u>Hines</u> to determine the correct weight to be given to Dr. Botros's opinion.

Commissioner contends that the opinion was properly afforded less than controlling weight because it was not supported by other objective medical evidence, which showed that Claimant's symptoms improved for Claimant to return to work. Further, the opinion was inconsistent with other evidence in the record: Claimant stated on three occasions she planned to return to work; Claimant received infrequent, conservative treatment; Claimant's symptoms were intermittent; treatment notes reveal Claimant's symptoms improved; Claimant reported that her aches and pains had disappeared; and Claimant performed a wide range of daily activities. Finally, Commissioner contends that opinions on disability are reserved for the ALJ.

After examining Dr. Botros's conclusions, the ALJ found that the opinion was "inconsistent with the objective findings on examinations, the claimant's response to treatment, the episodic nature of her symptoms, and the claimant's admitted, and significant daily activities, and thus not entitled to controlling weight." (Tr. 20). However, the ALJ also determined that the opinion was entitled to some weight" insofar as it is consistent and it is reflected in the residual functional capacity related to climbing hazards, noise, and routine tasks." (<u>Id</u>.).

Though the ALJ states that Dr. Botros's opinion is inconsistent with objective findings and Claimant's subjective testimony, the Court must agree with Claimant because the ALJ fails to cite specifically the medical records that are inconsistent with Dr. Botros's opinion and how the records are inconsistent with Dr. Botros's opinion. Nor does the ALJ cite Claimant's specific responses to treatment or Claimant's specific daily activities which contradict Dr. Botros's opinion. The ALJ simply makes a bare assertion that Dr. Botros's opinion "is inconsistent with objective findings on examinations." (Tr. 20). While it is the job of the ALJ to

determine issues of fact, without a full explanation, the Court is unable to review the ALJ's determinations to ensure the ALJ had substantial evidence to support her position.

Accordingly, the ALJ must, on remand, state with specificity in which ways the objective medical evidence is inconsistent with Dr. Botros's opinions.

Dr. Firdous

Claimant argues that the ALJ improperly gave only some weight to Dr. Firdous's opinion because it was inconsistent with the treatment records and Claimant's admitted daily activities. Claimant explains this was an error because, though Claimant did improve, the improvement periods were always followed by relapses, and the ALJ focused only on the parts of the record when Claimant was improving. Additionally, Claimant argues that had the ALJ properly weighed the five factors enumerated in Hines, the ALJ would have given more credit to Dr. Firdous's opinions.

Commissioner contends that the opinion was properly afforded less than controlling weight because it was not supported by other objective medical evidence and inconsistent with the probative evidence of record. Specifically, Commissioner argues that Dr. Firdous's opinion is contrary to his own medical findings, inconsistent with the opinions of the state agency psychologists, and contrary to Claimant's ability to perform activities of daily living.

After detailing Dr. Firdous's findings and his opinion, the ALJ found that Dr. Firdous's "assessment of the claimant's ability to function is completely inconsistent with his own treatment records that reflect response to treatment and that she is doing well, and it is inconsistent with the claimant's admitted, and significant daily activities. Therefore, Dr. Firdous' opinion is not entitled to controlling weight." (Tr. 21). However, the ALJ afforded

some weight "reflected in the residual functional capacity for routine tasks that entail few workplace changes."  (Id.).

Again, the Court must agree with Claimant because again the ALJ fails to cite with any specificity how Dr. Firdous's opinion is inconsistent with his own treatment records and Claimant's admitted daily activities.  The ALJ merely makes the bald assertion that it is inconsistent with the record.  Accordingly, on remand, the ALJ must examine the medical evidence of record and detail how the opinion is inconsistent with the objective medical evidence.

State Agency Medical and Psychological Consultants

Claimant argues that the ALJ improperly gave the opinions of the state agency medical and psychological consultants significant weight.  Claimant argues this was an error because the state agency medical and psychological consultants were non-examining physicians and their opinions alone cannot serve as substantial evidence to support a denial of disability benefits when they are contradicted by all other evidence in the record.

The Commissioner did not respond to this specific argument.

In her decision, the ALJ stated that she "is not bound by the conclusions of these experts [state agency medical and psychological consultants], but has considered their opinions and given them significant, but not controlling, weight in rendering this decision."  (Tr. 21).

Evidence from non-examining sources is considered as opinion evidence.  20 C.F.R. § 416.927(f) (West 2010).  Though "[a]dministrative law judges are not bound by any findings made by State agency medical or psychological consultants . . . [the consultants are] highly qualified physicians and psychologists who are also experts in Social Security disability

evaluation" and ALJs must consider their findings as opinion evidence. § 416.927(f)(2)(i).

When evaluating the findings of the State agency medical and psychological consultants, the

ALJ is to use factors set forth in the regulation, including, "the physician's or psychologist's

medical specialty and expertise in our rules, the supporting evidence in the case record,

supporting explanations provided by the physician or psychologist, and any other factors

relevant to the weighing of the opinions." § 416.927(f)(2)(ii). "Unless the treating source's

opinion is given controlling weight, the administrative law judge must explain in the decision the

weight given to the opinions of a State agency medical or psychological consultant . . . . " §

416.927(f)(2)(ii). "'[A] non-examining physician's opinion cannot, by itself, serve as substantial

evidence supporting a denial of disability benefits when it is contradicted by *all of the other*

*evidence* in the record.'" Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986) (citing Martin v.

Secretary of Health, Education and Welfare, 492 F.2d 908 (4th Cir. 1974)).

Though the State agency medical and psychological consultants are non-examining

physicians, their evidence is still to be considered by the ALJ as opinion evidence. Claimant

argues that the ALJ erred by considering the opinions because they were given significant weight

and cannot constitute substantial evidence to support a decision. Though Claimant is correct in

her assertion that the opinions of State agency medical and psychological consultants cannot

serve as substantial evidence to support a denial when all other evidence is contradictory,

Claimant is incorrect in its applicability to the ALJ's findings. Here, the ALJ stated that she had

"considered their opinions and given them significant, but not controlling, weight in rendering

this decision." (Tr. 21). Moreover, the ALJ states that "some weight" was given to the opinions

of both Drs. Botros and Firdous. Therefore, the ALJ could not have based her decision to deny

solely on the State agency opinions, and the opinions of the State agency consultants were not substantial evidence on which the ALJ relied to support her denial. Accordingly, Claimant's argument is without merit.

3.      Whether the ALJ Relied upon Flawed Vocational Evidence at Step Five of the Analysis

Claimant argues that the ALJ erred by failing to accept VE testimony that was based upon a hypothetical setting forth all of Claimant's limitations and basing the hypothetical solely upon the opinions of the non-examining State agency consultants. In the alternative, Claimant argues that even if the ALJ's findings encompassed all of Claimant's impairments, the Commissioner still failed to meet his burden of proving there is alternate work in the national economy for Claimant to perform.

Commissioner contends that the ALJ properly discounted the VE's response to the hypothetical question that included limitations from Dr. Botros's opinion, which the ALJ found to be unsupported by the record. Additionally, Commissioner argues that the ALJ met her burden because the ALJ meets her burden by establishing that at least one job exists in significant numbers in the national economy that Claimant can perform.

Once it is determined that a claimant has a severe impairment, yet the impairment does not meet a listing, the Commissioner must determine whether the claimant has the RFC to perform his/her past relevant work. Should the determination find that the claimant cannot perform his/her past work, then a determination is made, based on his/her RFC, if there are jobs in the national economy that claimant can perform despite limitations. An RFC is what a claimant can do despite his/her limitations. 20 C.F.R. § 404.1545 (West 2010). It is an assessment based upon all of the relevant evidence. Id. It may include descriptions that go

beyond the symptoms, such as pain, that are important in the diagnosis and treatment of a

claimant's medical conditions.  Id.  Observations by treating physicians, psychologists, family,

neighbors, friends, or other persons, of a claimant's may be used.  Id.  These descriptions and

observations must be considered along with medical records to assist the Social Security

Administration to decide to what extent an impairment keeps the claimant from performing work

activities.  Id.  This assessment is not a decision on whether a claimant is disabled but is used as

a basis for determining the particular types of work a claimant may be able to do despite his/her

impairments.  Id.

After determining the RFC, the ALJ must determine whether jobs exist in significant

numbers in the national economy for the claimant to perform.  To do this, the ALJ must pose

hypothetical questions to the vocational expert (VE).  The Fourth Circuit Court of Appeals has

held, albeit in unpublished opinion, that while questions posed to the VE must fairly set out all of

the Claimant's impairments, the questions need only reflect those impairments supported by the

record.  Russell v. Barnhart, 58 Fed. Appx. 25, 30; 2003 WL 257494, at 4 (4th Cir. Feb. 7,

2003)[6].  The Court further stated that the hypothetical question may omit non-severe

impairments but must include those that the ALJ finds to be severe.  Id.  Moreover, based on the

evaluation of the evidence, "an ALJ is free to accept or reject restrictions included in

hypothetical questions suggested by a Claimant's counsel, even though these considerations are

more restrictive than those suggested by the ALJ."  France v. Apfel, 87 F. Supp. 2d 484, 490 (D.

---

[6]  This Court recognizes that the United States Court of Appeals for the Fourth Circuit
disfavors citation to unpublished opinions.  I recognize the reasons for that position and
acknowledge it.  Unfortunately, there is not a better indicator of what its decision might be in
this regard.

Md. 2000) (citing <u>Martinez v. Heckler</u>, 807 F.2d 771, 774 (9th Cir.1986)).

The ALJ is afforded "great latitude in posing hypothetical questions." <u>Koonce v. Apfel</u>,[7] 166 F.3d 1209; 1999 WL 7864, at 5 (4th Cir. 1999) (citing <u>Martinez</u>, 807 F.2d, at 774). The ALJ need only pose those questions that are based on substantial evidence and accurately reflect the Claimant's limitations. <u>Copeland v. Bowen</u>, 861 F.2d 536, 540-41 (9th Cir. 1988); <u>see also</u> <u>Hammond v. Apfel</u>,[8] 5 Fed. Appx. 101,105; 2001 WL 87460, at 4 (4th Cir. 2001).

Here, Claimant argues that the ALJ improperly excluded from the hypothetical question possible absenteeism and the inability for an individual who can sit, stand, and walk for a total of five out of eight hours in a day to work as opined by Dr. Botros. Though the ALJ may exclude from the hypothetical question those impairments not supported by the record, the ALJ did not properly consider, and discredit, the opinions of Dr. Botros. Because the ALJ did not properly consider Dr. Botros's opinion, the ALJ could not have properly excluded the limitations from the hypothetical question. Accordingly, on remand, the ALJ must, after properly considering whether Dr. Botros's opinions were supported by the record, include in the hypothetical all limitations found supported by the medical record.

Because the Court agrees with Claimant that the ALJ failed to include all limitations potentially supported by the record, the Court need not determine whether the ALJ fulfilled her

_____

[7] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions. I recognize the reasons for that position and acknowledge it. Unfortunately, there is not a better indicator of what its decision might be in this regard.

[8] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions. I recognize the reasons for that position and acknowledge it. Unfortunately, there is not a better indicator of what its decision might be in this regard.

burden of identifying jobs in the national economy that Claimant could perform.

4.      Whether the ALJ Erred in Determining Claimant's Credibility.

Claimant argues that the ALJ failed to properly evaluate Claimant's credibility because she based the determination on many of the same inadequate findings for rejecting the opinions of Claimant's treating physicians and impermissibly placed weight on the fact that Claimant could engage in marginal daily activities.  Additionally, Claimant, relying on Pollock v. Astrue, 670 F.Supp.2d 484 (N.D.W.Va. 2009), argues that the ALJ erred by rejecting her subjective complaints because her symptoms rarely produce objective evidence; therefore, she is entitled to rely solely on testimony when proving that the she actually has the impairment causing her disabling symptoms.

Commissioner contends that substantial evidence supports the ALJ's finding and her assessment of Claimant's limitations.

The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints of pain in Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).  Under Craig, when a claimant alleges disability from subjective symptoms, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged.  Id. at 594.  The ALJ must next "expressly consider" whether a claimant has such an impairment.  Id. at 596.  If the claimant makes this showing, the ALJ must consider all evidence, including the claimant's statements about his symptoms, in determining whether the claimant is disabled.  Id. at 595.  While the ALJ must consider the claimant's statements, he need not credit them to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged.  Id.

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (7th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). An ALJ is afforded great deference in credibility determinations; however, the ALJ must sufficiently articulate the reasons for his credibility determination in order for the Court to uphold the determination. Neave v. Astrue, 507 F.Supp.2d 948, 962 (E.D.Wis. 2007). "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) (citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990)).

To evaluate the claimant's symptoms and determine the extent to which the symptoms limit the claimant's capacity to work, the ALJ is to consider the symptoms and objective medical evidence. 20 C.F.R. § 404.1529(c) (West 2010). When considering how to evaluate the claimant's symptoms, the ALJ is to consider:

(i)   [The claimant's] daily activities;
(ii)  The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv)  The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [the claimant's] pain or other symptoms;
(v)   Treatment, or other medication, [the claimant] receive[s] or ha[s] received for relief of [] pain or other symptoms;
(vi)  Any measures [the claimant] use[s] or ha[s] used to relieve [] pain or other symptoms; and
(vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

§ 404.1529(c)(3)(i)-(vii).  "While the ALJ need not elaborate on each of these factors when making a credibility determination, he must sufficiently articulate his assessment of the evidence to assure the court that he considered the important evidence and to enable the court to trace the path of his reasoning."  Neave, 507 F.Supp.2d at 963.

An ALJ often must make a finding on a claimant's credibility when evaluating symptoms, including pain, under 20 C.F.R. § 404.1529(c).  SSR 96-7p.  "Because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of objective medical evidence."  Id.  To determine the credibility, the ALJ must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record."  Id.

The Court begins its analysis determining that the ALJ properly followed the two-step analysis outlined in Craig.  First, the ALJ considered whether Claimant had an impairment and found that Claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . ."  (Tr. 19).  The ALJ then weighed Claimant's testimony in considering all the evidence and concluded that Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are

inconsistent with the above residual functional capacity." (Id.).

In accordance with the factors set forth in SSR 96-7p and § 404.1529(c), the ALJ examined Claimant's statements concerning the limiting effects of her symptoms, the objective medical evidence and treatment records, Claimant's daily activities, and the opinions of treating physicians. First, the ALJ examined Claimant's alleged fibromyalgia and found that "her exacerbations were intermittent in nature, they did not persist for more than a brief period of time, they responded to treatment . . . , and other trigger points during her episodic exacerbations findings on physical examinations were normal." (Tr. 19). Additionally, treatment records showed Claimant "had no stiffness, range of motion deficits, joint pain, back pain, muscle weakness or extremity swelling, reflexes were 2+ and symmetric, sensation was intact, motor power was 5/5 throughout, her rapid alternative movements were fast and symmetric, and her gait was normal." (Id.).

Second, the ALJ examined Claimant's alleged tremors and found that the treatment records support Claimant's allegations of neck and head tremors, but they do support the alleged severity. (Id.). Relying on the treatment records, the ALJ found that the physical examinations revealed the tremors "were mild in nature, her neck flexion was normal, and her facial movement and sensation were symmetric." (Id.). Additionally, the ALJ relied on Claimant's testimony describing the tremors "as very low amplitude and only occurring rarely (primarily when agitated), and admitted that they responded to medications." (Id.).

Third, with regard to Claimant's mental impairments, the ALJ relied on treatment records which showed that Claimant has a history of treatment for anxiety and depression starting in September 2006 after work altercations. (Id.). Despite the history, the ALJ found that the

treatment records do not reflect any required inpatient psychiatric hospitalizations and show that Claimant's symptoms responded to medications.  (Id.).  Additionally, the records reflect that by December 2006 Claimant "reported that she felt great, her panic attacks had subsided, and she was ready to go back to work."  (Id.).  The ALJ also relied on inconsistencies in subsequent records.  Later records reflected Claimant's "complaints of anxiety, problems dealing with stress, and memory and concentration loss;" however, Claimant also described her anxiety as "episodic in nature" and reported she "was doing well on prescribed medications."  (Tr. 20).  Further, findings on mental status examinations were "generally mild to moderate" with reports of Claimant being alert, oriented, and cooperative; having a broad affect, clear speech, an organized thought process, and no gross cognitive deficits; and having her recent memory, remote memory, persistence, and task within normal limits.  (Id.).

The ALJ also relied on Claimant's ability to perform activities of daily living.  Despite Claimant's argument to the contrary, both SSR 96-7p and § 404.1529(c) permit the use and evaluation of a claimant's activities of daily living when determining a claimant's credibility concerning statements about symptoms.  The ALJ permissibly relied on Claimant's admitted ability to take care of her own personal needs and the needs of her pets, perform household chores, prepare meals, walk for exercise, drive, shop, garden, sew and mend, play cards, baby-sit, and provide daycare.  (Id.).  Additionally, the ALJ found that despite Claimant's problems with stress, anxiety, memory, and concentration, Claimant watches television, reads, manages her own finances, handles changes in routines well; described her social skills as average; and stated she has no problems getting along with authority figures.  (Id.).

After examining all relevant evidence, the ALJ concluded that the "findings and activities

are clearly inconsistent with severe symptoms precluding all work-related activity . . . ."  (Id.).

Because the ALJ examined Claimant's testimony, treatment records, and activities of daily

living, the Court cannot say that the ALJ's credibility determination is not supported by

substantial evidence.  It is the duty of the ALJ to make determinations concerning Claimant's

credibility, and the Court is not able to overturn the ALJ's determination unless it is not

supported by substantial evidence.  The ALJ had more than a scintilla evidence to support her

determination.  Accordingly, Claimant's argument must fail.

 Next Claimant argues, relying on Pollock, that because her impairments do not produce

objective symptoms, she is entitled to rely on her subjective complaints.  In Pollock, this Court

held that "claimants are not automatically entitled to rely exclusively on subjective evidence to

show that they are unable to perform work eight hours per day, five days per week."  Pollock,

670 F.Supp.2d at 513. The claimant in Pollock argued that the ALJ improperly rejected her

testimony about her symptoms and side effects by finding that the objective medical evidence

did not support her alleged depression and her daily activities were not consistent with the

disability and that under Hines v. Barnart, 453 F.3d 559 (4th Cir. 2006), she was entitled to rely

exclusively on subjective evidence to prove her depression.  Id. at 512-13.  However, this Court

in Pollock narrowed the application of Hines to those circumstances where the claimant suffers

"from a disease that rarely produces objective medical evidence."  Id. at 513.

 Claimant argues that her alleged disabilities, stemming from fibromyalgia, depression,

and anxiety, fit within the confines of Hines and Pollock because they do not produce objective

medical evidence.  The Court cannot agree with this contention.  Claimant first relies on Johnson

v. Astrue, 597 F.3d 409 (1st Cir. 2009), to suggest that fibromyalgia cannot be diagnosed or

measured in severity based upon laboratory or diagnostic techniques; however, Claimant makes no specific reference to anywhere in the <u>Johnson</u> opinion to suggest that fibromyalgia cannot be diagnosed or measured using laboratory or diagnostic techniques. In <u>Johnson</u>, the Court found that the patient's subjective reports *to the doctor* are an essential diagnostic tool in fibromyalgia cases and "trigger points are the only 'objective' signs of fibromyalgia." <u>Johnson</u>, 597 F.3d, at 412. Both the subjective reports and trigger points are placed into a physician's report, which is then relied on by the ALJ when making the credibility determination. Thus, the subjective reports and trigger points actually *are* the objective medical evidence, which the ALJ may consider and compare to the claimant's subjective complaints and testimony.

Similarly, Claimant relies on <u>Clester v. Apfel</u>, 70 F.Supp.2d 985 (S.D.Iowa 1999), to suggest that mental impairments cannot be diagnosed or measured in severity based upon laboratory or diagnostic techniques. Again, Claimant's reliance is misplaced. In <u>Clester</u>, the Court examined whether the ALJ's residual functional capacity finding ignored the limitations imposed by the severe impairment - organic personality disorder. <u>Clester</u>, 70 F.Supp.2d at 990. The Court found that it did. In his finding, the ALJ rejected the opinion of the treating physician because "it was 'not supported by objective medical evidence from other physicians or by the claimant's own admission of numerous daily activities.'" <u>Id</u>. The Court rejected the Commissioner's argument that the ALJ's rejection was permissible because the doctor had not performed any testing upon which to base his opinion. <u>Id</u>. Rather, the Court found that the treating physician performed a mental status examination, the results of which provided the basis for the diagnostic impression of a psychiatric disorder. <u>Id</u>. Therefore, <u>Clester</u> does not stand for the proposition that mental impairments cannot be diagnosed; rather, the <u>Clester</u> Court found that

the mental status examinations given by treating physicians provide the basis for diagnosing a patient. Again, then, it is the diagnostic impressions in the treatment records that the ALJ will use as objective medical evidence to determine credibility.

Furthermore, even though fibromyalgia, depression, and anxiety do not produce outright, visible objective symptoms, nothing in Pollock or Hines prohibits an ALJ from examining treatment records from physicians and psychologists and comparing them to the claimant's subjective complaints. To prohibit the ALJ from examining the treatment records disregards the direct teachings of SSR 96-7p and § 404.1529(c). As this Court specifically stated in Pollock, "[a]lthough a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, *they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment*, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers." Pollock, 670 F.Supp.2d at 513. Accordingly, an ALJ may always look to any available evidence in the record to compare to a claimant's subjective complaints.

In accordance with the explanation detailed above, the ALJ did not err in her credibility analysis.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1. Claimant's Motion for Summary Judgment be **DENIED** and the matter be **REMANDED**. The ALJ did not err by finding Claimant not disabled under either Listing 12.04 or 12.06, nor did the ALJ err in her credibility analysis. However, the ALJ failed to correctly

evaluate the opinions of Claimant's treating physicians and, therefore, erred in developing a hypothetical question to pose to the Vocational Expert.

      2.      Commissioner's Motion for Summary Judgment be **DENIED** and the matter be **REMANDED** for the same reason set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: June 10, 2010

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE